FILED

08/20/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 8, 2020

**CORDELL ASH v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 14-04488       Carolyn W. Blackett, Judge**

_____

**No. W2019-01172-CCA-R3-PC**
_____

A Shelby County jury convicted the defendant, Cordell Ash, of especially aggravated robbery, attempted first-degree murder, employing a firearm during the commission of a dangerous felony, and being a convicted felon in possession of a handgun. Following a sentencing hearing, the trial court imposed an effective sentence of thirty years in confinement. In this delayed appeal, the defendant argues the trial court erred in denying his motion for mistrial after the victim made a reference to the defendant's alleged gang activity. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT W. WEDEMEYER, J., joined.

Patrick E. Stegall, Memphis, Tennessee, for the appellant, Cordell Ash.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Paul Hagerman and Anita Spinetta, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On January 7, 2013, Derrick Key and his girlfriend, Patrice Gayden, were watching television in their apartment. Mr. Key decided to go to a nearby gas station to pick up snacks, and, as he was walking down the stairs outside of his apartment, Mr. Key heard two voices below him saying "drop it off, freeze, drop it off, freeze, freeze, freeze."

Because Mr. Key knew the phrase "drop it off" meant a robbery was occurring, he quickly ran down the stairs and into the street. Mr. Key was two houses down from his apartment building when the first assailant caught up to him, grabbed the back of his shirt, and hit him in the head with a gun. Mr. Key turned around and saw that both assailants were wearing homemade ski masks.

Mr. Key initially believed he could overpower the assailants because of their small size. However, he reasoned that they would shoot him if he tried to fight back, so he put his hands up and began backing away from the two men. The assailants began hitting Mr. Key repeatedly with their guns, causing him to fall against a nearby gate. One of the assailants was "swinging wildly," and his mask came off of his face and became stuck in his braids. Mr. Key saw the man's face and recognized him as the defendant, whom Mr. Key had known for approximately twenty years from the neighborhood Boys and Girls Club. Specifically, Mr. Key recognized the defendant's "distinctive," "smushed in nose, [which] gave him clean away." However, Mr. Key did not know the defendant's real name and had always called him "Little Cord" or "Little Foo Foo."

The defendant and his accomplice asked Mr. Key where his money was, and Mr. Key, who had $23 on him, told them it was in his left pocket. The men then pulled Mr. Key's pants off and ran away. At that point, Mr. Key believed the ordeal was over. However, when the men were several yards away, they turned around and began shooting at Mr. Key, who was still on the ground. After the defendant and his accomplice finally left, Mr. Key began walking towards his apartment, initially unaware that he had been shot three times in his legs.

While waiting for Mr. Key to return, Ms. Gayden heard a voice outside of her apartment screaming "help me, stop." She looked outside and saw two men beating up another man in the middle of the street. One of the assailants pulled the victim's pants off and shot the victim before running away. Ms. Gayden did not initially realize Mr. Key was the victim of the assault until she saw him walking back toward their apartment. When he reached their apartment building, Mr. Key collapsed in the exterior stairwell, and Ms. Gayden called 911. While waiting for an ambulance to arrive, Mr. Key believed he was going to die and told Ms. Gayden to let his mother and daughter know that he loved them.

The next day at the hospital, Mr. Key told his mother, Cheryl Dockery, and Ms. Gayden that the defendant was one of his attackers. However, he did not initially disclose this information to the police because he was afraid of retaliation in his neighborhood. Eventually, Mr. Key's mother convinced him to tell the police what he knew, and he told detectives that "Little Cord" was one of his assailants. Several days later, Mr. Key was shown a photo line-up and identified the defendant's photograph.

Officer Nathan Newman with the Memphis Police Department responded to a shooting call at Mr. Key's apartment. When he arrived, Officer Newman discovered Mr. Key in the stairwell in front of the apartment building. Mr. Key was suffering from multiple gunshot wounds to his legs and was slow to respond to Officer Newman's questions. Following his interaction with Mr. Key, Officer Newman proceeded to secure the scene and locate evidence. On the sidewalk in front of the apartment building, Officer Newman located two .40 caliber shell casings, a spent projectile, Mr. Key's cell phone, and two bags of cocaine.

Officer Sam Blue with the Memphis Police Department's Crime Scene Investigation Unit also responded to the scene. Upon arriving at the apartment building, Officer Blue photographed the scene and collected the evidence previously located by Officer Newman. Because the crime scene was outdoors and in a public space, Officer Blue acknowledged he could not be certain the evidence located at the scene was relevant to this case.

At trial, the State called Patrice Gayden, Derrick Key, Officer Nathan Newman, Officer Sam Blue, and Cheryl Dockery as witnesses, and all rendered testimony consistent with the foregoing. Juaquatta Harris with the Shelby County Sheriff's Office testified she is responsible for monitoring and disseminating inmate phone calls, and, in February 2013, Ms. Harris received a request from Sergeant Eric Petrowski to monitor the defendant's jail calls. The State played several of the defendant's jail calls for the jury, and Ms. Harris agreed they did not contain a confession of any kind from the defendant. However, the defendant did tell Mr. Key's brother, Lacy, to "keep [the defendant's] name out of it." Additionally, in several calls, the defendant told the person on the other end of the call to "make sure dude doesn't come to court."

On cross-examination, Mr. Key admitted to having a pending drug case and acknowledged he used drugs following the shooting. However, Mr. Key testified he was clean for several years prior to his attack and only began using again after he suffered an emotional breakdown following the shooting. Mr. Key also acknowledged that his trial testimony was the first time he stated under oath that the reason he waited a month to tell the police the defendant's name was because he was worried for his safety.

The defendant called Jimmy Beale, Jr., Ethel Bowen, Nigel Lewis, Sergeant Eric Petrowski, Nadia Toney, and Officer Christopher Beaty as witnesses.

Jimmy Beale, Jr. testified he met the defendant following the defendant's release from federal prison in 2012. They became friends, and the defendant began living at Mr. Beale's house with Mr. Beale and his father. Mr. Beale runs a well-known recording studio out of his house, and several people in the neighborhood, including Mr. Key, come to the

studio to record music. Mr. Beale testified the defendant could not have shot Mr. Key because the defendant was at Mr. Beale's recording studio on the day of the shooting with Mr. Beale and several other people. On cross-examination, Mr. Beale admitted he never told police the defendant was with him on the day of the shooting.

Ethel Bowen, the defendant's grandmother, testified she approached Mr. Key prior to one of the defendant's court appearances. Ms. Bowen told Mr. Key that the defendant was not the person who shot him. However, Mr. Key stated he saw the defendant's face when the defendant's mask came off during the altercation and became caught in the defendant's braids. Ms. Bowen tried to explain that this was impossible because the defendant's hairline is far back on his head, but Mr. Key was insistent the defendant was one of his attackers. Mr. Key then told Ms. Bowen that if the defendant did not tell Mr. Key who shot him, the defendant was "going to do 60 years." On cross-examination, Ms. Bowen admitted she did not know the defendant's whereabouts on the night of the shooting.

Nigel Lewis, an attorney with the Shelby County Public Defender's Office, testified he represented the defendant for a short time prior to the defendant's trial. At one of the defendant's hearings, Mr. Lewis spoke with Mr. Key and asked him about the shooting. During their conversation, Mr. Key requested that Mr. Lewis ask the defendant who committed the crime. However, during the hearing, when Mr. Lewis cross-examined Mr. Key about their prior conversation, Mr. Key denied making such a request. On cross-examination, Mr. Lewis acknowledged that there were two perpetrators and that Mr. Key was never able to identify the second suspect.

Sergeant Eric Petrowski, an investigator with the Memphis Police Department, testified he was the lead investigator in this case. Sergeant Petrowski spoke with Mr. Key in the hospital following the shooting, and Mr. Key stated he was able to recognize one of his attackers because the eye holes in his mask were too big. However, at that time Mr. Key did not provide his attacker's name. Several weeks later, Sergeant Petrowski received a call from Mr. Key, who identified "Little Cord" as one of the perpetrators. Using this information, Sergeant Petrowski developed the defendant as a suspect. Sergeant Petrowski acknowledged he did not test the evidence found at the crime scene for fingerprints and did not ask Mr. Key about the cocaine found at the crime scene. On cross-examination, Sergeant Petrowski agreed the defendant never stated he was at the recording studio with Mr. Beale at the time of the shooting and did not provide an alibi of any kind.

Nadia Toney, the defendant's aunt, testified she went to school with Mr. Key's mother and had known Mr. Key for several years. Prior to one of the defendant's court appearances, Ms. Toney and her mother, Ms. Bowen, approached Mr. Key, who described the details of the robbery and shooting. After Ms. Bowen walked away, Mr. Key told Ms.

Toney that the defendant would go to jail if he did not tell Mr. Key who shot him. Additionally, Mr. Key told Ms. Toney that he had "some guys" who were waiting on his word to "do something" to the defendant. On cross-examination, Ms. Toney admitted she never reported Mr. Key's threat to the police.

Officer Christopher Beaty with the Memphis Police Department testified he did not recall responding to the scene of Mr. Key's shooting or any details surrounding the investigation. However, he acknowledged that the police report listed him as the responding officer and that it was likely he wrote the narrative included in the report. Officer Beaty agreed Ms. Gayden is the only person listed as a witness in the report, which describes two suspects with fade hairstyles. On cross-examination, Officer Beaty admitted that, because he could not recall this incident, he did not know where he acquired the suspect information in the report.

Following deliberations, the jury found the defendant guilty on all counts, and the trial court subsequently sentenced the defendant to an effective sentence of thirty years in confinement at 100 percent. The defendant filed a motion for new trial[1], arguing the evidence was insufficient to support his convictions; the trial court prejudiced the jury by characterizing defense counsel's cross-examination of a State's witness as confusing; and the trial court erred in excluding relevant evidence, finding the State had proven every element of the offenses, allowing a witness to offer testimony which alleged gang activity, allowing the admission of recorded jail conversations, and instructing the jury.

Following the trial court's denial of the motion for new trial, no notice of appeal was filed. On September 12, 2018, approximately three years after the denial of the defendant's motion for new trial, the defendant attempted to file a document entitled "Petition for Delayed Appeal (T.C.A. § 40-30-113)." This Court found the defendant was attempting to file a petition for post-conviction relief and held the trial court was in the best position to determine whether the defendant was deprived of his right to appeal his convictions and sentence. Following the appointment of counsel, the trial court held a hearing and granted the defendant's petition for delayed appeal. This timely appeal followed.

### *Analysis*

The defendant's sole issue on appeal is the trial court's denial of the defendant's motion to declare a mistrial. Specifically, the defendant argues Mr. Key's reference to the defendant as a gang member was highly prejudicial. The State contends the defendant has

---

[1] The record does not contain the defendant's motion for new trial. However, the amended motion for new trial, which was filed on the morning of the motion for new trial hearing, is included in the record.

waived this issue for failing to include it in his motion for new trial. Furthermore, the State argues the defendant is not entitled to relief under the plain error doctrine because no clear and unequivocal rule of law was breached. We agree with the State.

We must first address the State's contention that the defendant's issue is waived for failing to include it in his motion for new trial. While the defendant's motion for new trial challenged the trial court's decision to allow Mr. Key to testify regarding alleged gang activity, the defendant failed to challenge the trial court's denial of the motion for mistrial in both his written motion and during the hearing on his motion for new trial. "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e). Therefore, the defendant's issue is waived. While the State argued waiver in its brief, the defendant chose not to file a reply brief, and he has not requested plain error review. Nonetheless, we will review this issue under the plain error doctrine.

Before an error may be recognized under the plain error doctrine, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). In *State v. Smith*, our Supreme Court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

(a) The record must clearly establish what occurred in the trial court;

(b) A clear and unequivocal rule of law must have been breached;

(c) A substantial right of the accused must have been adversely affected;

(d) The accused did not waive the issue for tactical reasons; and

(e) Consideration of the error is "necessary to do substantial justice."

24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

The defendant contends the trial court erred in denying his motion for mistrial following Mr. Key's testimony regarding the defendant's alleged gang affiliation. The State submits the defendant failed to establish Mr. Key's testimony precluded an impartial verdict.

During Mr. Key's cross-examination, the following exchange occurred while discussing Mr. Key's month-long delay in identifying the defendant as one of the perpetrators:

DEFENSE COUNSEL:     At what point were you in fear?

MR. KEY:    What you mean? Somebody can kill you. I'm up here telling on the person who shot me even though I know I ain't doing nothing wrong.

DEFENSE COUNSEL:     Right.

MR. KEY:    He's a gang member. He got 50 people under him listening to him that's going to do what he say.

Thereafter, a bench conference was held, and the following exchange occurred:

DEFENSE COUNSEL:     I'm going to ask for a mistrial.

TRIAL COURT:     Why?

DEFENSE COUNSEL:     Because the witness has repeatedly – I tried to let it go and he repeatedly alleged but there is no proof in the record that my client is a gang member. He's attempted to say that my client has been – he's going –

TRIAL COURT:     That is purely a credibility question as to whether or not somebody is able to judge any witness who took the stand.

. . .

DEFENSE COUNSEL:     The problem is what question did I ask him to ask him about some 50 members of gang members up under him who he can tell what he wants to do. Tell me what question I asked him that asked that.

TRIAL COURT:     Excuse me?

DEFENSE COUNSEL:    What question did I ask him that elicited a statement that says he has 50 gang members under him?

TRIAL COURT:    Look, when I give the instructions in the final instructions, his credibility is to be weighed with any other witness, whether they believe him or not.  There's a lot of things he's already said that it is a jury question as whether or not they believe his credibility, okay.

DEFENSE COUNSEL:    Judge –

TRIAL COURT:    Now anything that goes to whether or not he's been convicted or something like that, that's very different.  But people can say – make all kinds of allegations while they're on the witness stand.

DEFENSE COUNSEL:    That's not true.

TRIAL COURT:    And that's not grounds for a mistrial and I will not declare a mistrial on that.

The decision of whether to grant a mistrial is within the sound discretion of the trial court.  *State v. McKinney*, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996).  Normally, a mistrial should be declared only in the event that a manifest necessity requires such action. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991).  "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000).  The burden to show the necessity for a mistrial falls upon the party seeking the mistrial.  *Id.* This Court will not disturb the trial court's decision unless there is an abuse of discretion. *State v. Adkins*, 786 S.W.2d 642, 644 (Tenn. 1990).  In evaluating whether the trial court abused its discretion, we may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

In applying these factors to the present case, we first note the State did not elicit the testimony from Mr. Key.  Instead, Mr. Key's unprompted statement regarding the defendant's alleged gang affiliation came during questioning by defense counsel on cross-examination.  Secondly, although the trial court did not give a curative instruction following Mr. Key's statement, the defendant did not request an instruction.  He has, therefore, waived consideration of this factor.  *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Jones*, 733 S.W.2d 517, 522 (Tenn. Crim. App. 1987)

(holding the failure to request a curative instruction constituted a failure to nullify the harmful effect of improper testimony). Finally, the case against the defendant was strong. Mr. Key testified he was able to see the defendant's face when the defendant's homemade ski mask came off during the altercation. Mr. Key identified the defendant, who he had known for several years, both in court and in a photo line-up. Additionally, although Mr. Key waited several weeks to give the police the defendant's name, he testified he told Ms. Gayden and Ms. Dockery about the defendant's involvement while he was in the hospital following the shooting, which was corroborated by the testimony of both Ms. Gayden and Ms. Dockery.

Because all three factors weigh in favor of the State, we conclude the defendant has not established the "manifest necessity" required for a mistrial. Thus, the trial court did not abuse its discretion in denying the defendant's request for a mistrial, and the defendant has not established that a clear and unequivocal rule of law was breached. He is not entitled to plain error relief. *See Adkisson*, 899 S.W.2d at 640-41.

## *Conclusion*

Based on the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
J. ROSS DYER, JUDGE